Mary DAVIS, Plaintiff-Appellee, Cross-Appellant,

v.

Joseph A. CALIFANO, Secretary of Health, Education and Welfare, Defendant-Appellant, Cross-Appellee.

Nos. 78–2374, 78–2375.

United States Court of Appeals, Seventh Circuit.

Argued April 24, 1979.

Decided July 25, 1979.

John W. Wojciechowski, Social Security Div., Baltimore, Md., for defendant-appellant, cross-appellee.

Barbara L. Samuels, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiff-appellee, cross-appellant.

Before FAIRCHILD, Chief Judge, MOORE, Senior Circuit Judge,* and WOOD, Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Henry Davis, a truckdriver, died in 1972. One year later his two wives applied for widow's insurance benefits under the Social Security Act, 42 U.S.C. § 401 *et seq.* The Secretary of Health, Education and Welfare ruled that the first wife, Novella, was the "legal" widow. The second wife, Mary, filed this action against the Secretary in federal district court. The district court judge, while finding that Novella was the "legal" widow, ordered that the two wives split the widow's insurance benefits. The Secretary appealed the district court's order, and Mary cross-appealed. We note jurisdiction under 28 U.S.C. § 1291.

In 1922 Henry Davis married Novella Harrison in Obrion County, Tennessee. In 1938, three years after their fifth child was born, Henry deserted the family, and on grounds of abandonment Novella obtained a "divorce from bed and board," a legal order of separation in Dresden, Tennessee.[1] Novella never asked for a decree of absolute divorce and remained in Tennessee. She continued to use the name Mrs. Henry Davis and raised the five children alone.

In 1940 while employed as an interstate truckdriver, Henry met Mary Day, in Martin, Tennessee. He told her that he had been previously married to Novella Davis, that they were divorced in Dresden, Tennessee,[2] and that he was jailed on one occa-

---

* Senior Circuit Judge Leonard Page Moore of the United States Court of Appeals for the Second Circuit is sitting by designation.

1. The decree, dated June 15, 1938, declared: "It is therefore ordered, adjudged and decreed by the Court that the complainant be given and can have a *divorce from 'bed and board' from* the defendant, with the reservation that the complainant may be granted an absolute divorce at a subsequent term."

2. Before the administrative law judge at the original hearing on January 6, 1975, Mary Davis answered the following questions under oath:

Q: When and where do you believe [Novella Davis] was divorced from him or he from her?

A: It would have to be Dresden, Tennessee. Have to be. He had a bed and board divorce.

Q: Huh?

A: He had a bed and board divorce.

sion for failure to make "alimony" payments.[3] Mary never examined, nor did she ask to see, the actual divorce decree. In 1942 in St. Louis, Missouri, Henry and Mary were married and they immediately moved to Chicago where they resided for the next thirty years. They were divorced in 1954 in Illinois but remarried in 1955. For the next 17 years Henry and Mary lived together continuously as husband and wife until Henry's death in 1972. No children resulted from Henry's second marriage.

After Henry's death Mary applied in January 1973 for Social Security disabled widow's insurance benefits on the account of Henry, the wage earner. The present controversy began in April 1973 when, also on Henry's account, Novella applied for widow's insurance benefits.

Under the Social Security Act, widow's insurance benefits are payable to the widow or the surviving divorced wife of an individual who died fully insured if the wife (a) has not married, (b) has attained age 60, or has reached 50 years of age but has not yet attained age 60 and is under a disability, and (c) has filed an application, 42 U.S.C. § 402(e). The term "widow" means the surviving wife of the insured, 42 U.S.C. § 416(c).

There are two methods for qualifying for widow's insurance benefits. A spouse qualifies under the state marital status test, which looks to the law of the state of the insured worker's domicile at the time of the worker's death, if the courts of that state would find either that: (a) the two were "validly married," or (b) the applicant, although not validly married, may be considered the widow "if such applicant would, under the laws applied by such courts in determining the devolution of intestate personal property, have the same status with respect to the taking of such property as a . . . widow." 42 U.S.C. § 416(h)(1)(A).[4]

If an applicant cannot pass the state marital status test, the applicant may still receive widow's benefits under the "purely 'federal' marital status test." Martin, *Social Security Benefits for Spouses*, 63 Cornell L.Rev. 789, 818 (1978). Congress established this test in 1960 by amending the Act to provide benefits to individuals who, because of a legal impediment under state law, had invalid marriages and were consequently ineligible to receive benefits. *See* S.Rep.No.1856, 86th Cong., 2d Sess., *reprinted in* [1960] U.S.Code Cong. & Admin.News pp. 3608, 3629. Section 416(h)(1)(B), generally known as the "deemed spouse" provision, requires that: (a) the applicant married the wage earner in good faith, without knowing of the legal impediment to the validity of the marriage, (b) the applicant was living with the wage earner at the time of his death, and (c) no other widow "is or has been entitled to a benefit" under the

---

At the second, supplemental hearing on May 13, 1977, Mary testified again:

Q: Did [Henry Davis] ever qualify, when he said divorce, by saying a legal separation or separate maintenance, or bed—and board divorce. How did he characterize the—

A: He said he was divorced, that was it.

Q: —just plain divorced?

A: Just plain divorced.

3. Henry was actually incarcerated for his failure to make separate maintenance payments.

4. Section 416(h)(1)(A) states:

An applicant is the . . . widow . . . of a fully or currently insured individual for purposes of this subchapter if the courts of the State in which such insured individual is domiciled at the time such applicant files an application, or, if such insured individual is dead, the courts of the State in which he was domiciled at the time of death, or, if such insured individual is or was not so domiciled in any State, the courts of the District of Columbia, would find that such applicant and such insured individual were validly married at the time such applicant files such application or, if such insured individual is dead, at the time he died. If such courts would not find that such applicant and such insured individual were validly married at such time, such applicant shall, nevertheless, be deemed to be the . . . widow . . . of such insured individual if such applicant would, under the laws applied by such courts in determining the devolution of interstate personal property, have the same status with respect to the taking of such property as a . . . widow . . . of such insured individual.

state marital status test. 42 U.S.C. § 416(h)(1)(B).[5]

A "legal impediment" to the validity of a purported marriage is defined as resulting from either the lack of dissolution of a previous marriage or a defect in the marriage ceremony, 42 U.S.C. § 416(h)(1)(B). *See also* S.Rep.No.1856, 86th Cong., 2d Sess., *reprinted in* [1960] U.S.Code Cong. & Admin.News pp. 3608, 3629 and 3685. Section 416(h)(1)(B) also includes a clause for terminating the payments of a deemed widow once the "legal widow" has made a formal application for widow's benefits, 42 U.S.C. § 416(h)(1)(B).

Mary's initial application was denied at both the initial and reconsideration levels because Mary failed to meet the disability requirement under the Social Security Act, 42 U.S.C. § 402(e). In 1975 Mary's application was reviewed, a hearing was held and an administrative law judge in Chicago decided that Mary was not entitled to widow's benefits because she was neither disabled nor the legal widow of Henry. In April 1976 the administrative law judge's decision was affirmed by the Social Security Appeals Council and adopted as the final decision of the Secretary of Health, Education and Welfare.

Pursuant to 42 U.S.C. § 405(g), Mary Davis filed suit in district court in June 1976 seeking review of the Secretary's decision denying her claim for widow's disability insurance benefits. Mary sought a reversal of the Secretary's decision claiming, among other things, that (1) the Secretary erroneously placed the burden of proof on the plaintiff to prove dissolution of a previous marriage, (2) the Secretary's decision was unsupported by substantial evidence, and (3) the deemed spouse exception in 42 U.S.C. § 416(h)(1)(B), inoperable if a legal widow was eligible for benefits, violated the equal protection and due process guarantees of the Fifth Amendment.

The district court referred the case to a magistrate, and, upon a motion by the Secretary, the magistrate remanded the cause on April 11, 1977, for further administrative proceedings on the issues of whether Mary was disabled and whether she was the legal widow of the deceased wage earner, Henry Davis. Following a second hearing the second administrative law judge issued a recommended decision on May 25, 1977. In his decision the administrative law judge commented on Illinois law:

There can be no doubt that in Illinois a divorce from an earlier marriage will be presumed in order to sustain the validity of a second marriage. *Sparling v. Industrial Commission,* 48 Ill.2d 332 [270 N.E.2d 411] (1971); *Johnson v. Johnson,* 114 Ill. 611 [3 N.E. 232] (1885); *Coal Run*

---

**5.** Section 416(h)(1)(B) provides in relevant part:

[If] it is established to the satisfaction of the Secretary that such applicant in good faith went through a marriage ceremony with [the wage earner] resulting in a purported marriage between them which, but for a legal impediment not known to the applicant at the time of such ceremony, would have been a valid marriage, and such applicant and the insured individual were living in the same household at the time of the death of such insured individual . . . such purported marriage shall be deemed to be a valid marriage. The provisions of the preceding sentence shall not apply (i) if another person is or has been entitled to a benefit . . . on the basis of the wages and self-employment income of such insured individual and such other person is (or is deemed to be) a . . . widow . . . of such insured individual under subparagraph (A) [the state law test] at the time such applicant files the applica-

tion, or (ii) if the Secretary determines, on the basis of information brought to his attention, that such applicant entered into such purported marriage with such insured individual with knowledge that it would not be a valid marriage. The entitlement to a monthly benefit . . . based on the wages and self-employment income of such insured individual, of a person who would not be deemed to be a . . . widow . . . of such insured individual but for this subparagraph, shall end with the month before the month (i) in which the Secretary certifies . . . that another person is entitled to a benefit. . . . For purposes of this subparagraph, a legal impediment to the validity of a purported marriage includes only an impediment (i) resulting from the lack of dissolution of a previous marriage or otherwise arising out of such previous marriage or its dissolution, or (ii) resulting from a defect in the procedure followed in connection with such purported marriage.

*Coal Co. v. Jones*, 127 Ill. 379 [8 N.E. 865] (1889); *Schmisseur v. Beatrie*, 147 Ill. 210 [35 N.E. 525] (1893); *Cole v. Cole*, 153 Ill. 585 (1894); *Winter v. Dibble*, 251 Ill. 200 [95 N.E. 1093] (1911); *Matthes v. Matthes*, 198 Ill.App. 515 (1916); *In re Estate of Dedmore*, 257 Ill.App. 519 (1930); *In re Estate of Pancio [Panico]*, 268 Ill.App. 585 (1932); *Baer v. DeBerry*, 31 Ill.App.2d 86 [175 N.E.2d 673] (1961). Equally clear are the statements of the Supreme Court of Illinois which declare that "the presumption may be rebutted by evidence which, standing alone, affords reasonable grounds for concluding that no divorce has been secured" citing *Schmisseur v. Beatrie*, 147 Ill. 210, 217 [35 N.E. 525] (1893); *Cole v. Cole*, 153 Ill. 585, 587–588 [38 N.E. 703] (1894); *In re Estate of Pancio [Panico]*, 268 Ill.App. 585, 590–591 (1932); *In re Estate of Dedmore*, 257 Ill.App. 519, 522–523 (1930). *Sparling v. Industrial Commission*, 48 Ill.2d 332, 336–337 [270 N.E.2d 411] (1971). The burden of proof is initially upon the person asserting the invalidity of the second marriage. *Johnson v. Johnson*, 114 Ill. 611, 617 [3 N.E. 232] (1885). This burden requires the proof of a negative contention. In *Schmisseur v. Beatrie*, 147 Ill. at 217 [35 N.E. 525], the court stated that "it is well settled, that a party is not required to make plenary proof of a negative averment. It is enough that he introduces such evidence as, in the absence of all counter testimony, will afford reasonable ground for presuming that the allegation is true: and when this is done the *onus probandi* will be thrown on his adversary."

The administrative law judge then isolated the central issue of the case, considered the evidence and made findings of fact: [6]

> The crucial query in the instant case is whether the first wife, Novella Davis, has presented sufficient evidence so as to overcome the presumption favoring the validity of the marriage between Mary

and Henry Davis and thereby shifting the burden of proof to Mary Davis to show that there was, in fact, a divorce *a vinculo matrimonii*.

> Novella Davis testified at the hearing or deposition taken in her behalf that there has never been an absolute divorce or divorce *a vinculo matrimonii* so as to dissolve the marital status between herself and Henry R. Davis. The June 15, 1938 decree of "divorce from bed and board" or a divorce *a mensa et thoro* is granted at the discretion of the court and is clearly not considered to be a final and absolute divorce (section 36–802 T.C.A.). In 1963 the divorce statute of Tennessee was amended so as to allow either party to a "divorce from bed and board" to petition for an absolute divorce after two years. Novella Davis also testified that to her knowledge the deceased, Henry R. Davis, did not avail himself of this right and that she was never summoned to appear for any action instituted by Henry R. Davis.

> The record shows that when Henry Davis left Tennessee in 1942 he and Mary V. Davis came to Chicago, Illinois and so remained for the duration of his life. There was testimony that between about 1940 and 1942 Mr. Davis frequently traveled in the course of his employment, but there is no indication that he actually resided in any other state other than Tennessee during this period. . . . The record contains evidence that the records of Weakley County, Tennessee, Chicago, Illinois and the various branch courts of Cook County, Illinois, were searched in order to ascertain whether Henry R. Davis obtained a divorce from Novella Harrison Davis. The record searches revealed no evidence of such a divorce. (Exhibits 31 to 35).

> It is the opinion of the undersigned Administrative Law Judge that no final or absolute decree of divorce was ever

---

**6.** The administrative law judge made no explicit factual finding regarding the status of Mary Davis as a deemed widow, but the record as a whole would substantially support a finding

that, if Novella Davis had not applied for widow's benefits, Mary would have qualified as a deemed widow. In his brief the Secretary concedes that the same conclusion is inescapable.

issued which dissolved the matrimonial status between Henry and Novella Davis and that Henry Davis erroneously relied upon a decree of "divorce from bed and board" in his belief that the marital status between himself and Novella Davis was absolutely dissolved. . . .

Novella Davis never remarried and continued to use the name of Henry R. Davis. Henry Davis, although he did travel in the course of this employment between 1940 and 1942, resided in Tennessee until 1942 and thereafter in Chicago, Illinois until his death. There are strong equities favoring a woman who spent thirty years as the wife of an individual, but there are equally strong equities for one who raised five children that resulted from a marriage to the same individual. The Administrative Law Judge recognizes these competing forces, but is compelled to follow the law of Illinois. The present law in the State of Illinois would find that Novella Davis has succeeded in rebutting the presumption in favor of the validity of the second marriage to Mary V. Davis and that Mary V. Davis has not, in fact, shown that Henry R. Davis secured a divorce *a vinculo matrimonii* from Novella Davis as required by the Social Security Act. Since Mary Davis is not the widow of Henry Davis, I need not decide the issue of "disability." However, since this decision is merely a recommended decision and need not be followed by the Appeals Council, I feel constrained to note that in my opinion Mary Davis, from the medical evidence before me, is "disabled" within the meaning of the Act.[7]

The administrative law judge then made these recommended findings:

1.  Novella Harrison Davis and Henry R. Davis entered into a valid ceremonial marriage on November 12, 1922 in the State of Tennessee.

2.  Novella Davis secured a divorce from bed and board from Henry R. Davis on June 15, 1938 in the State of Ten-

nessee, but this divorce from bed and board never became a final and absolute divorce.

3.  Henry R. Davis married Mary Day Davis on November 9, 1942 in Missouri and remarried her on February 4, 1955 in Mississippi without ever obtaining a final divorce from Novella Davis.

4.  The legal widow of Henry R. Davis under the law of Illinois is Novella Davis, the first and undivorced wife.

On July 29, 1977, the Appeals Council adopted the administrative law judge's findings and conclusions as their own and rejected Mary Davis' claim of entitlement to widow's insurance benefits.

After the cause was returned to the magistrate, both the plaintiff and the Secretary filed cross motions for summary judgment. On February 14, 1978, the magistrate recommended to the district court that the defendant be granted summary judgment and that the case be dismissed. Subsequently, the plaintiff filed timely exceptions to the magistrate's report requiring the court to make a *de novo* determination of the merits of the cross motions. 28 U.S.C. § 636(b)(1).

In granting the Secretary's motion for summary judgment on June 5, 1978, the district court judge considered three arguments advanced by the plaintiff. First, the court noted that although the plaintiff styled her allegations of error to sound as though the Secretary misinterpreted Illinois law in applying the state standard for rebutting the presumption of the validity of a subsequent marriage, the plaintiff was actually objecting to a determination by the Secretary which rested only in fact. The plaintiff urged the district court to accept the notion that since Henry worked as a long distance truck driver for four years between his separation from Novella and his second marriage to Mary, he may have established residence anywhere in the continental United States for purposes of obtain-

---

7.  The administrative law judge's finding that Mary was disabled was not appealed by the Secretary and is, therefore, not a subject in this appeal.

ing an absolute divorce from Novella. The district court reviewed the evidence and concluded, "There is substantial evidence from which to find that it was unlikely that Henry resided other than in Tennessee and Illinois and that negative searches of divorce records in the appropriate counties in those states were sufficient to rebut the presumption of validity of the second marriage." Second, the district court concluded that the challenged statutory section, 42 U.S.C. § 416(h)(1)(B), divesting a "deemed widow" of benefits because of the presence of a supervening claimant, was constitutional, *see Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). In rejecting the due process and equal protection claim, the court commented that although the plaintiff asserted that Section 416(h)(1)(B) was arbitrary and capricious, she did not contend the Congress is constitutionally obliged to prefer a "deemed widow" to an "actual widow" as a claimant for widow's benefits. The court added, furthermore, that the plaintiff did not, and could not, argue that the government was constitutionally commanded to pay twice—full benefits to each widow. Third, the plaintiff urged the court to follow a Second Circuit decision, *Rosenberg v. Richardson*, 538 F.2d 487 (2d Cir. 1976), and divide the benefits equitably between Mary and Novella. Persuaded by *Rosenberg*, the district court judge, despite the grant of summary judgment to the defendant, awarded widow's benefits to Mary Davis. Following the Second Circuit's formula, the judge figured that Mary should receive a residual payment equal to the difference between the maximum widow's benefits payable on the insured's account and the amount by which the legal widow's Social Security payments had been increased by virtue of her certification as the legal widow, *Rosenberg v. Richardson, supra* at 491.

A subsequent court order entered after the submission of additional evidence from the Social Security Administration determined the precise amounts of widow's benefits payable to Novella and Mary. Under the applicable payment schedule the maximum widow's benefit payable on Henry's account is $380.70 per month. Novella was already receiving $163.70 per month in retirement insurance benefits based on her personal retirement account. Pursuant to the operation of 42 U.S.C. § 402(k)(3)(A), however, Novella could not receive the sum of $380.70 and $163.70, because her widow's benefit, the $380.70, must be reduced by an amount equal to her present retirement payments, $163.70.[8] Accordingly Novella stands to receive $380.70 in benefits, an increase of $217.00. Mary's award of residual widow's benefits, the difference between the maximum of $380.70 and Mary's $217.00 increase in benefits, is $163.70 per month in current payments. The district court also ordered that Mary should receive back benefits of $8,659.20.

Two questions are raised in this appeal. The first question we consider, raised by the plaintiff's cross-appeal, is whether the Secretary, and subsequently the district court, were correct in finding that Novella Davis was the widow of Henry Davis under Illinois law. The second question, raised by the Secretary's appeal, is whether the district court erred in awarding a share of widow's insurance benefits to a "deemed widow" when a "legal widow" was entitled to the widow's benefits on the account of the same insured individual.

**I.**

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), establishes the standard

---

**8.** Section 402(k)(3)(A) provides in pertinent part:

If an individual is entitled to an old-age or disability insurance benefit for any month and to any other monthly insurance benefit for such month, such other insurance benefit for such month, . . . shall be reduced, but not below zero, by an amount equal to such old-age or disability insurance benefit.

This section, responsible for the creation of the *Rosenberg* "windfall," is central to the congressional scheme of allocation enacted "to avoid duplicate benefit payments." H.Rep.No.1300, 81st Cong., 1st Sess. 58 (1949). Where there is simultaneous entitlement to multiple benefits, the Congress has thus decided to place a ceiling on the maximum benefits payable.

for judicial review of the first issue: "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." We are restricted in our review of administrative determinations, *Williams v. Califano,* 593 F.2d 282 (7th Cir. 1979), as we cannot make our own appraisal of the evidence, *Johnson v. Weinberger,* 525 F.2d 403, 406–07 (7th Cir. 1975), *Lahr v. Richardson,* 476 F.2d 1088, 1090 (7th Cir. 1973), and we, like the district court, must uphold the Secretary's factual determinations if they are "supported by substantial evidence," 42 U.S.C. § 405(g).

The last word from the Supreme Court of Illinois in the case of conflicting marriages of the same spouse was that in the absence of evidence to the contrary, the first marriage will be presumed to have ended in a divorce in order to save the second marriage. *Sparling v. Industrial Commission,* 48 Ill.2d 332, 336–37, 270 N.E.2d 411, 413 (1971). The Supreme Court also declared that "the presumption may be rebutted by evidence which, standing alone, affords reasonable grounds for concluding that no divorce has been secured." *Id.*

■ In finding that Novella was the legal widow of Henry under Illinois law, the Secretary made these ancillary findings: Novella secured a separation from Henry, no final or absolute divorce was ever entered dissolving Novella and Henry's marriage, and Henry resided in only two places, Tennessee and Illinois. The Secretary also determined, and the district court also affirmed, that Novella succeeded in rebutting the Illinois presumption favoring the validity of the second marriage between Mary and Henry and that Mary, once the burden shifted to her, failed to show that Henry in fact secured a divorce from Novella. The plaintiff challenges these findings.

Substantial evidence supports the Secretary. The record shows that the divorce documents in Dresden (Weakley County), Tennessee, and Chicago (Cook County), Illinois, were carefully searched to discover whether Henry obtained a divorce from Novella. The record searches revealed nothing.

The probative value of the negative searches was bolstered by Novella's and Mary's testimony, *infra,* and particularly by this colloquy with Mary:

Q: Did [Henry] ever mention where he was divorced?

A: No sir. But it would have to have been Dresden, Tennessee.

Q: Well, where—don't tell me where you think it had to be, did he ever tell you, I was divorced in Dresden, Tennessee—

A: Yes, sir.

Q: —or any other place. Is that were (sic) he—

A: Yes sir, Dresden.

Q: —did he tell you that specifically—

A: Yes.

Q: —he was divorced there?

A: Yes, Dresden, Tennessee.

Q: From Novella Davis?

A: Yes, sir.

Furthermore, Novella testified that she never received any papers or a final decree of divorce from Henry.

In the face of Mary's testimony and evidence of the negative searches of divorce records in the counties where Henry resided, the plaintiff would have us imagine that Henry disappeared between 1938 to 1940 and that during the two-year period he established residency in some unknown jurisdiction and secured a divorce there from Novella.[9] In support of her position she attaches significance to the fact that the separation order obtained by Novella was entered *pro confesso,* and, therefore, she concludes that the defendant, by not answering the complaint, "may have already been residing in another jurisdiction." The plaintiff also claims in her brief that Novella's testimony "tends to confirm this possibility." Novella testified, in part, that "[Henry] was generally on the road all the time a trucking."

---

9. The plaintiff does not question Henry's residencies before 1938 or after 1940.

The plaintiff's notion is no more than wishful thinking. Supporting the Secretary's conclusion that Henry resided only in Tennessee and Illinois, Novella testified that after Henry abandoned her and the five children in 1938 or 1939, he stayed in Tennessee for about a year, worked at the Clifton Weldons and then moved to Chicago. Mary herself testified that when she first met Henry in 1940 he was living with his sister and brother-in-law, the Weldons, in Martin, Tennessee. Mary's other testimony, regarding the time Henry was incarcerated for failure to make separate maintenance payments to Novella, also placed Henry in Dresden, Tennessee in the 1938–40 period.

The only evidence that the plaintiff has cited us in the record to show that Henry could have possibly resided in a place other than Tennessee and Illinois is testimony from Mary who stated that in his employment as a trucker he traveled for long periods of time into Michigan and Louisiana. An examination of her testimony in the record reveals, however, that Mary saw Henry "maybe once a week, maybe once a month" when he traveled into those states. The relevant time period: the initial months after they met in *1940*. By the plaintiff's own admission, Henry at that time was a resident of Tennessee.

The plaintiff's position is based upon sheer speculation and conjecture. Henry was not a wanderer like Aeneas, Ulysses or Gulliver. There was no missing, unexplained or mysterious two-year void in Henry's life between 1938–40. He was simply a truck driver and, like many interstate haulers, he may have been home only on the weekends.

We have carefully and thoroughly examined the record as a whole, and we, like the district court, conclude that the Secretary's findings are supported by substantial evidence.

## II.

The Secretary argues in his appeal that the district court erred in allowing Mary Davis widow's insurance benefits in accordance with the formula devised by the Court of Appeals in *Rosenberg v. Richardson,* 538 F.2d 487 (2d Cir. 1976). In urging a reversal of the district court, the Secretary attacks the applicability of *Rosenberg* to these facts. He further contends that the formula directly contravenes the congressional intent and statutory language, extends beyond a liberal construct of the Act, and, in creating a class of beneficiaries specifically excluded by Congress from entitlement, establishes a precedent which endangers the integrity of the Social Security Trust Fund. The plaintiff responds claiming that the *Rosenberg* formula properly interprets the statute in accordance with a broad construction of the Act designed to effectuate humanitarian purposes and that the court order does not harm the trust fund. We agree with the Secretary.[10]

We stated earlier that the explicit language of Section 416(h)(1)(B) provides that the deemed spouse provision does not operate if a legal widow under Section 416(h)(1)(A) "is or has been entitled to a benefit." 42 U.S.C. § 416(h)(1)(B). The legislative history surrounding the amendment, although sparse, is instructive in resolving the conflict between the entitlement of a deemed spouse upon the entitlement of a legal spouse. The House Ways and Means Committee reported unequivocally: "An applicant who went through a marriage ceremony with an insured individual will not be deemed to be the . . . widow . . . of that insured individual if another person is or has been entitled to . . . widow's . . . benefits based on the insured individual's earnings and the other person has the status of . . . widow . . . of the insured individual at the time the application for benefits is filed." H.Rep.No.1799, 86th Cong., 2d Sess., *reprinted in* [1960] U.S.Code Cong. & Ad-

---

10. In accordance with Circuit Rule 16(e), this opinion has been circulated among the active members of this court. A majority does not favor rehearing *in banc.* Judge Luther M. Swygert voted to rehear the issue *in banc.*

min.News pp. 3608, 3684. Favoring the legal widow over the deemed widow, the Congress also included a mechanism for terminating the payments to a deemed widow once the legal widow made a formal application for widow's benefits. 42 U.S.C. § 416(h)(1)(B). Again the legislative history gives us guidance: "The benefits of a person who has been deemed to be a . . . widow . . . under the provisions of the new subparagraph will end if (and with payment for the month before the month in which) the Secretary certifies that benefits are payable to a person who was validly married to the insured individual." H.Rep. No.1799, 86th Cong., 2d Sess., *reprinted in* [1960] U.S.Code Cong. & Admin.News pp. 3608, 3684. A plain and fair reading of Section 416(h)(1)(B) leaves no room for question, doubt or ambiguity. Congress decided that there can be no deemed spouse receiving widow's benefits if the legal widow is entitled to the benefits. 42 U.S.C. § 416(h)(1)(B); *see Woodson v. Califano,* 455 F.Supp. 457 (S.D.Tex.1978); *McGuire v. Califano,* 440 F.Supp. 1031 (D.Neb.1977). In the present case we have already affirmed the Secretary's determination that Novella Davis is Henry's legal widow. Mary, therefore, is precluded from receiving benefits.

Following *Rosenberg v. Richardson, supra,* the district court awarded Mary back benefits and widow's benefits. In *Rosenberg* Max Rosenberg and Celia Beck were married in 1920 in New York City. Thirteen years later Max, dissatisfied with the marriage, procured a Mexican divorce by mail. Celia eventually found employment, never remarried and saw little of Max after the divorce. Two years after his Mexican divorce Max married Frieda Silverstein in 1935 in a Connecticut civil ceremony. Max and Frieda, both New York domiciliaries, celebrated their marriage in Connecticut because a lawyer advised them that the neighboring state recognized the effectiveness of Max's Mexican divorce from Celia, thereby rendering the subsequent marriage valid. For the next 36 years Max and Frieda lived together as husband and wife. While Frieda was a housewife responsible

for raising the couple's two children, Max, an electrician, supported the family and for many years his salary included a tax deduction to the Social Security fund.

After Max's death in 1971 both Frieda, and Celia who had had no communications with Max for the last 20 years of his life, applied for widow's benefits. The Secretary ruled in 1971 that, since New York courts would consider Max's *ex parte* Mexican divorce ineffective in dissolving his marriage with Celia, Celia was Max's widow. After a hearing in 1973 the administrative law judge found that Max and Frieda's marriage was entered in good faith and all other requirements of the deemed spouse provision were satisfied. *See* 42 U.S.C. § 416(h)(1)(B). However, the judge held that Frieda, who had been receiving widow's benefits, could no longer receive payments because Celia had been certified as Max's legal widow.

The maximum widow's benefit payable on Max's account was $165.20 monthly. By virtue of her personal retirement account Celia was already receiving $163.80 per month. Thus, pursuant to the operation of 42 U.S.C. § 402(k)(3)(A), Celia's estimated widow's benefit, $165.20, was reduced to an amount equal to her present retirement payments, $163.80. Accordingly, Celia was entitled to an increased monthly benefit of $1.40.

Reversing the district court's grant of the government's motion for judgment on the pleadings, the Second Circuit stated that "we cannot agree that Congress intended a 'deemed' widow in Frieda's position to forfeit *all* benefits merely because an infinitesimal fraction of the full widow's benefit that Max paid for from his hard earned wages was required to go to his 'legal widow.'" *Rosenberg v. Richardson,* 538 F.2d at 490. The Court of Appeals outlined general principles of statutory interpretation and reasoned that the result—Celia was entitled to $1.40 and Frieda was allowed $163.80 as the residual balance of the full widow's benefit—was consonant with a liberal construction of the insurance program of the Social Security Act, Max's expecta-

tion that the benefiting widow would be Frieda, and the language of the Act.

We conclude that Mary Davis, unlike Frieda Rosenberg, must receive nothing. There are numerous, sharp and crucial factual distinctions between the cases. The case before us does not involve "an inadvertent and unforeseen error"—poor legal advice—and the "extraordinary circumstances" which dominate the *Rosenberg* opinion.[11] The critical factor which compelled that court to divide the benefits between the legal and deemed widows was the fact that the first wife Celia, the legal widow, could only benefit by $1.40 or by less than 1% of the widow's benefit. In great contrast Novella, the legal widow and first wife of Henry, may enjoy a large $217.00 increase in overall benefits and receive more than 57% of the payable widow's benefit.

Even if the factual chasm that separates the cases were not so wide, we would part company with the reasoning of the Second Circuit. Although there is a place for the liberal construction of some laws, there is little room here. No legislative history, statutory language or case law under Section 416(h)(1)(B) suggests that any strength

should be accorded an insured individual's expectations in a clash with state law. In fact the Supreme Court has cautioned that an employee's noncontractual interest in the Social Security system, financed by tax contributions, cannot be analogized to the contractual rights in a private insurance plan based on premium payments. *Flemming v. Nestor,* 363 U.S. 603, 610, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). We are similarly unconvinced by the rationale, essential to the Court of Appeals' conclusion, which asserts that the legislative history "leaves no room for doubt" that Congress intended to terminate a deemed widow's benefits only if the legal widow could receive the "full benefit." *Rosenberg* at 491. The legislative history which is cited, H.Rep.No. 1799, 86th Cong., 2d Sess., *reprinted in* [1960] U.S.Code Cong. & Admin.News pp. 3608, 3684, lends little, if any, support for the assertion, and such an interpretation ignores the plain meaning of 42 U.S.C. §§ 402(k)(3)(A) and 416(h)(1)(B).[12] *See also* Martin, *Social Security Benefits for Spouses,* 63 Cornell L.Rev. 789, 819 (1978) (*Rosenberg* decision is "unsupportable"). The Congress, recognizing that persons may have entitlement to multiple benefits, enacted Section 402(k)(3)(A) to establish a

11. The Court of Appeals noted the "extraordinary circumstances" of the case:

It is therefore difficult to understand why the Government has, in this case, spent seven years and untold thousands of dollars in administrative and legal fees in a seemingly rigid and arbitrary attempt to deprive Freida Rosenberg of the modest Social Security widow's benefits Max Rosenberg paid for and wished her to receive.

We should observe at the outset, that the Government concedes that Max and Frieda lived together as man and wife for thirty-six years, from the time of their marriage in 1935 to Max's death in 1971. Nor is it disputed that their wedding was undertaken in good faith reliance upon legal advice that Max's Mexican divorce from his former wife, Celia Rosenberg, would be recognized as valid. Because the lawyer's advice seems to have been in error, Celia Rosenberg, as Max's "legal" widow, has been permitted to augment her own old age insurance benefits by the insignificant sum of $1.40 per month. Yet, Max Rosenberg sacrificed a significant portion of his weekly paychecks over decades of employment to build a widow's benefit fund of $165.20 per month for Frieda, the woman

he regarded for thirty-six years as his lawful wife. It is not consistent with the beneficent spirit of the Social Security Act that the Treasury should confiscate this entire fund, intended to serve as a means of support for a 69-year-old woman, merely because an inadvertent and unforeseen error allowed another, under the extraordinary circumstances present here, to have a claim on less than 1% of the fund. We cannot agree with the Secretary that the payment of $1.40 per month to Celia must cause Frieda to forfeit the entire $165.20 to the Treasury as a windfall. 538 F.2d at 488.

12. The *Rosenberg* opinion mistakenly suggested that 42 U.S.C. § 402(k)(3)(A) allows the Treasury to "confiscate" a "windfall." The actual recipient of the remainder, after the widow's benefit payable on the deceased husband's account is reduced by the amount a widow receives on her own earnings account, is the Social Security Trust Fund which must pay the benefits and expenses of the program. *See Flemming v. Nestor,* 363 U.S. 603, 609, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).

maximum level of benefits. *See* footnote 8. There is no authority that persuades us that Congress intended to suspend the operation of the statute for a new category, the deemed spouse. We are convinced that there can be no deemed spouse receiving benefits if the legal widow is entitled to the payment, 42 U.S.C. § 416(h)(k)(B), as we cannot close our eyes to clear congressional intendment. The Congress declined to command the Social Security Administration to pay widow's insurance benefits to two widows, and so must we. In some ways this is a disturbing and inequitable result. We understand the desire of the district court to work out a division of the payments. It may not have been a bad solution, but we do not believe it to be good law.

The finding by the Secretary, affirmed by the district court, that under Illinois law Novella Davis is the legal widow is affirmed. The order by the district court awarding Mary Davis widow's insurance benefits is reversed.

Affirmed In Part, Reversed In Part.